UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------X
                                                             :
TYESHA WASHINGTON,                                           :
                                                             :
                        Plaintiff,                           :
                                                             :            18-CV-9052 (PAC)
        -against-                                            :
                                                             :
NYC MEDICAL PRACTICE, P.C., SERGEY                           :        OPINION & ORDER
VOSKIN, and ANTHONY RAY PERKINS,                             :
                                                             :
                        Defendants,                          :
                                                             :
-------------------------------------------------------------X
```

The resolution of this medical malpractice case turns on the application of the sensible

(but often overlooked) aphorism:  read the fine print before signing a contract.  Plaintiff Tyesha

Washington ("Plaintiff" or "Washington") is an Ohio resident who received a buttock

augmentation procedure at NYC Medical Practice, P.C. ("Goals"), a medical corporation located

in New York City.  Following her cosmetic surgery, Washington experienced bleeding and

infection at the operative site, requiring her to undergo additional medical treatment and remedial

surgery.

As a result of her injuries, Washington contacted Goals to request a refund of her surgical

procedure.  Goals promptly obliged.  But in consideration for the refund payment, Goals

requested that Washington sign a one-page agreement releasing Goals, Dr. Anthony Ray Perkins

(the operating surgeon), and Goals' owner, Dr. Sergey Voskin (collectively "Defendants") from

any potential liability related to the buttock augmentation procedure.  Washington signed that

general release.  But shortly thereafter, she filed this medical malpractice suit against the

Defendants for their alleged negligence in performing her cosmetic surgery.[1]

Defendants now move for summary judgment, contending that the general release agreement precludes the present lawsuit.[2]  Washington opposes the summary judgment motion. She raises several objections to the validity of the general release agreement, but the nub of her arguments comes down to this:  that she neither read nor adequately comprehended the legal implications of the general release agreement and therefore that this Court should not enforce it.

Washington's failure to read the fine print before signing on the dotted line cannot preclude summary judgment.  Because the Court must enforce the general release agreement as written, the motion for summary judgment is **GRANTED.**

## BACKGROUND

### I.      The Lift Procedure

Most of the facts underlying this motion are simple enough and uncontroverted.  Goals is a medical company based in New York City that offers a menu of cosmetic medical services, including cosmetic plastic surgery, body contouring, anti-aging techniques, and facial rejuvenation procedures.  (Amend. Compl. ¶¶ 6, 16, ECF 14; Pls.' Opp. Br. at 4, ECF 50.)  Dr. Voskin is the sole owner of Goals.  (Amend. Compl. ¶ 8.)  One of the surgical procedures that Goals offers is the Liposuction 360/Brazilian Butt Lift (the "Lift Procedure").  (Pls.' Opp. Br. at 4.)  The Lift Procedure, which seeks to enhance the silhouette of an individual, involves (1)

---

[1] The Court has diversity jurisdiction over this case because there is complete diversity between the parties and the amount in controversy exceeds $75,000.  *See* 28 U.S.C. § 1332(a).

[2] The Defendants filed separate moving papers in support of summary judgment.  (ECF 40, 45.)  Dr. Perkins' motion, however, appears to have been made under Rules 12(b)(1) and (b)(6) of the Federal Rules of Civil Procedure.  (Perkins Mot. at 1, ECF 45.)  Because Dr. Perkins' motion "relies on matters outside the pleadings, the Court may convert a motion to dismiss into a motion for summary judgment under Rule 56, Fed. R. Civ. P." *Muhammad v. Schriro*, No. 13-CV-1962 PKC, 2014 WL 4652564, at *3 (S.D.N.Y. Sept. 18, 2014) (cleaned up).

removing excess fat from parts of the patient's body by liposuction; (2) purifying that fat; and (3)

re-injecting the purified fat into the buttocks of the patient.  (*Id.*)

In February 2018, Washington entered into an agreement with Goals to receive the Lift

Procedure at a total cost of $5,850.[3]  (Cruz Decl. Ex. 1 ("Lift Procedure Contract"), ECF 43-1.)

On May 22, 2018, Washington traveled to the Goals facility in New York City to undergo the

Lift Procedure.  (Pls.' Opp. Br. at 4; Goals Br. at 2, ECF 41.)  Dr. Perkins, a duly licensed

physician in the state of New York and an employee of Goals, performed the operation.

(Amend. Compl. ¶¶ 12, 21.)  In the days following her surgery, Washington received follow-up

medical care and treatment at Goals.  (Pls.' Opp. Br. at 4.)

On or about May 27, 2018, Washington returned home to Ohio, at which point she began

to feel serious pain in and around the operative site.  (*Id.*; Goals Br. at 2.)  On May 30, she was

diagnosed with Liposuction burn at the Good Samaritan Hospital in Dayton, Ohio.  (Pls.' Opp.

Br. at 4; Goals Br. at 2.)  And in the ensuing days, Washington's condition worsened as the

operative site became infected.[4]  (Washington Dep. 18:15–18, ECF 51-7.)  Finally, on June 20,

Washington was re-hospitalized at the Miami Valley Hospital, where she underwent remedial

---

[3] The agreement contained a "Results & Complications" section, which read:

> The practice of medicine and surgery is not an exact science.  Although good results are anticipated, there
> can be no guarantee or warranty, expressed or implied, by anyone as to the actual results of the
> Procedure.  Revisions and or other medical treatments or management of problems or complications
> may be required.  These may result in additional charges for which you are responsible.

(Cruz Decl. Ex. 1 ("Lift Procedure Contract"), ECF 43-1.)

[4] According to Washington, the operative site grew infected after she had applied a medicinal cream prescribed by
Goals.  (Washington Dep. 18:1–9, ECF 51-7.)

surgery.  (Pls.' Opp. Br. at 4; Goal Br. at 2.)

## II.      The General Release Agreement

Following her June 20 remedial surgery, Washington was prescribed oxycodone to help

alleviate her post-surgical pains.  (Pls.' Opp. Br. at 4; Blau Decl. Ex. J ("Oxycodone

Prescription"), ECF 51-10.)  Around the same time, Washington reached out to Goals with

updates on her condition and to request a full refund of the Lift Procedure.  (Pls.' Opp. Br. at 5.)

While the parties dispute the extent to which Washington was under the influence of prescription

drugs during these exchanges, it is undisputed that (1) Plaintiff initiated contact with Goals (Pls.'

Stmt. 56.1 ¶ 4, ECF 52) and (2) Plaintiff provided Goals with specific details about her

condition—including scanned photographs of the infection site—in support of her claim for a

refund.  (Washington Dep. 19:3; Cruz Decl. Ex. 3 ("Call Logs"), ECF 43-3.)

Goals promptly agreed to refund Washington a total of $6,095.00.  (Goals Br. at 2.)  But

in exchange for the payment, Goals asked Washington to sign a one-page general release

agreement (the "General Release").  (*Id.*)  The General Release, in relevant part, provided:

1. **Release**:  Tyesha Washington . . . . hereby voluntarily, irrevocably and
   unconditionally releases and forever discharges NYC Medical Practice, P.C. d/b/a
   Goals Aesthetics and Plastic Surgery from any claims she has, or may have, against it
   . . . . [or its] trustees, agents, insurers, representatives, attorneys, fiduciaries,
   administrators, directors, supervisors, doctors, nurses, medical assistants, physician's
   assistants, independent contractors, managers and employees (hereafter, collectively,
   as the "Releasees"), from any and all rights, manner of action and actions . . . . which
   Tyesha Washington now has, or has ever had, against NYC Medical Practice, P.C.
   d/b/a Goals Aesthetics and Plastic Surgery and its associated Releasees, for, upon or
   by reason of any matter, cause or claim of whatsoever kind, including any
   malpractice claims, existing on or prior to the time of the execution of this
   Agreement, whether known or unknown, for the following:

   **Related to the procedure you received from NYC Medical Practice, P.C. d/b/a
   Goals Aesthetics and Plastic Surgery on June 22, 2018 and your care thereafter
   or any complications therefrom**

   Any claims not specifically related to the procedure you received from NYC Medical

4

Practice, P.C. d/b/a Goals Aesthetics and Plastic Surgery on June 22, 2018 and your
care thereafter or any complications therefrom, or not logically the natural result
thereof, are not subject to the within release.

(Cruz Decl. Ex. 4 ("General Release"), ECF 43-4.) (emphasis in original).

Without having read its terms or understanding its legal implications, Washington signed

the General Release on June 29, 2018 before an Ohio notary.[5] (Pls.' Opp. Br. at 5; Washington

Dep. 29:1.) The notary certified that Washington had appeared and signed the General Release

"as her voluntary act and deed."[6] (General Release at 2.)

### III.     Procedural History

Washington initiated this lawsuit on October 3, 2018 (ECF 1) and amended her complaint

on November 14. (ECF 12.) Following a pre-motion conference on January 30, 2019, the Court

by written order directed the parties to conduct limited discovery on the issue of whether the

General Release was legitimately executed. (Order, ECF 23 ("2019 Order").) However, because

of several disputes that delayed the production of discovery, the Court convened the parties for

another conference on January 8, 2020. (2020 Conf. Tr., ECF 30.) During that conference, the

Court provided tailored discovery instructions to the parties, namely that Washington be deposed

and that the parties produce limited discovery regarding the validity of the General Release. (*Id.*

at 10–14.) The parties subsequently conducted that discovery and this summary judgment

---

[5] Because she was allegedly under the heavy influence of medication, Washington's friend, LaDonna Miller, helped
"her understand what she was signing and ensure that all documents were executed to obtain a refund." (Pls.' Stmt.
56.1 ¶ 4, ECF 52.)

[6] To date, Washington has received only $5,750 of the $6,095 that was promised by Goals in consideration for
signing the General Release. (Perkins Br. at 14.)

motion followed.  (ECF 40, 45.)

## LEGAL STANDARD

A party may move for (and a court will grant) summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment is appropriate where "after adequate time for discovery and upon motion," the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In deciding a summary judgment motion, the district court must "resolve all ambiguities and draw all reasonable inferences in the light most favorable to the nonmoving party."  *Summa v. Hofstra Univ.*, 708 F.3d 115, 123 (2d Cir. 2013).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  "[T]he substantive law . . . identif[ies] which facts are material," and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly prelude the entry of summary judgment."  *Id.* at 248.  "[A] material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  If "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).  Thus "a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat a motion for summary judgment] . . . ."  *Anderson*, 477 U.S. at 252.

## ANALYSIS

### I.       Procedural Objections

As a preliminary matter, Washington contends that the Court should defer ruling on this

summary judgment motion because there has been insufficient discovery produced between the

parties on the issue of the General Release's enforceability.  (Pls.' Opp. Br. at 6–8.)  Because the

enforceability of the General Release is a "fact-intensive determination," Washington argues that

she should be allowed to (1) depose the Defendants and a related party; (2) have the Defendants

file an answer to her Amended Complaint; and (3) receive production of additional discovery

that may be pertinent to this summary judgment motion.  (*Id.*)

The Court, however, has already resolved these discovery issues.  On January 30, 2019,

the Court by written order directed the parties to conduct limited discovery on the issue of

whether the General Release was properly executed.  (*See* 2019 Order.)  On January 8, 2020,

during a follow-up conference with the parties, the Court expounded upon its initial order, going

so far as to provide specific instructions on which documents were to be produced and who were

to be deposed in connection with the issue of the General Release's validity.  (2020 Conf. Tr. at

10–14.)  Because the parties subsequently conducted that discovery pursuant to the Court's

instructions, the Court sees no reason to revisit its prior rulings on these discovery issues.

Moreover, the Court is unpersuaded by Washington's suggestion that the present factual

record is too slender a reed upon which to decide this summary judgment motion.  (Pls.' Opp.

Br. at 6–8.)  The record, as it stands, presents more than enough evidence to dispose of this

motion:  Washington has been deposed, pertinent documents regarding the General Release have

been produced, and most, if not all, the disputes in this motion arise from application of law to

7

fact.  Therefore, the Court concludes that the summary judgment motion may be adjudicated.[7]

## II.    The General Release's Enforceability

Turning to the merits, the dispositive issue underlying this motion is the enforceability of

the General Release under New York law.[8]  "It is well established in New York that a valid

release which is clear and unambiguous on its face and which is knowingly and voluntarily

entered into will be enforced as a private agreement between parties."  *DuFort v. Aetna Life Ins.*

*Co.*, 818 F. Supp. 578, 581 (S.D.N.Y. 1993) (cleaned up); *see Centro Empresarial Cempresa*

*S.A. v. Am. Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011) (stating that "a valid release

constitutes a complete bar to an action on a claim which is the subject of the release").  "Thus, a

release will be binding on the parties absent a showing of fraud, duress, undue influence, or some

other valid legal defense."  *DuFort*, 818 F. Supp. at 581.  The issue of whether an agreement is

ambiguous is a question of law to be decided by the court.  *See W.W.W. Assocs., Inc. v.*

*Giancontieri*, 77 N.Y.2d 157, 162 (1990).

Washington lodges two arguments against the validity of the General Release.  *First*, she

contends that the General Release is ambiguous because it lists June 22, 2018 as the date of the

Lift Procedure (for which liability is waived), when in fact the Lift Procedure occurred a month

---

[7] Washington's fleeting argument that the summary judgment motion is unripe because Defendants "never answered the Complaint" must also be rejected for two reasons.  (Pls.' Opp. Br. at 1, ECF 50.)  *First*, Washington waived this argument when the parties initially agreed to the bifurcated discovery schedule whence this case has proceeded. (*See* Order, ECF 23 ("2019 Order").)  *Second*, "a court need not postpone ruling on a motion for summary judgment where the moving defendant has failed to file an answer if the answer would not clarify the issues raised by the motion nor aid the court in determining whether there are any genuine issues of material fact that would preclude granting summary judgment."  *Oakley v. Dolan*, No. 17-CV-6903 (RJS), 2021 WL 92623, at *1 (S.D.N.Y. Jan. 11, 2021) (cleaned up).  Accordingly, because Defendants' Answer would not clarify or aid the resolution of the issues raised in this motion, especially where discovery has already been conducted, Washington's argument must be rejected.  *See id.*

[8] The General Release has a choice of law provision, which states that any disputes arising from the General Release will be governed by New York law.  (*See* Cruz Decl. Ex. 4 ("General Release"), ECF 43-4.)  Accordingly, New York law governs this summary judgment motion.

earlier, on May 22, 2018.  (Pls.' Opp. Br. at 13–15; *see* General Release at 1.)  *Second*,

Washington asserts that the General Release is voidable because she was mentally incapacitated

when she signed the agreement.  (*Id.* at 11–12.)  For the reasons that follow, both arguments

must be rejected.

### A. *Ambiguity (or Scrivener's Error)*

Given that the Lift Procedure took place on May 22, 2018 but the General Release

reflects June 22, 2018 as the date of operation, the parties dispute whether this presents (a)

ambiguity (thereby defeating summary judgment) or (b) a scrivener's error (which lends itself to

equitable reformation).  The Court concludes scrivener's error.

"In contract law, a scrivener's error, like a mutual mistake, occurs when the intention of

the parties is identical at the time of the transaction but the written agreement does not express

that intention because of that error; this permits a court acting in equity to reform an agreement."

*Wilton Reassurance Life Co. of New York v. Smith*, No. 12-CV-5131 SLT VMS, 2015 WL

631973, at *16 (E.D.N.Y. Feb. 13, 2015) (cleaned up).  "Where there is no mistake about the

agreement and the only mistake alleged is in the reduction of that agreement to writing, such

mistake of the scrivener, or of either party, no matter how it occurred, may be corrected."  *Born*

*v. Schrenkeisen*, 17 N.E. 339, 341 (1888); *see 82-90 Broadway Realty Corp. v. New York*

*Supermarket, Inc.*, 62 N.Y.S.3d 186, 188 (2017) (N.Y. App. Div. 2d Dep't 2017).

Applying these principles, the Court finds the June 22, 2018 date on the General Release

to be a scrivener's error subject to equitable reformation.  *Born*, 17 N.E. at 341; *82-90*

*Broadway*, 62 N.Y.S.3d at 188.  There is no dispute that when the General Release was executed,

the parties intended the Lift Procedure to be the subject of the release agreement.  (*See*

Washington Dep. 26:3–28:5; Perkins Br. at 8–9, ECF 65.)  Moreover, there is no dispute that the

parties, at the time, understood the Lift Procedure to have occurred on May 22, 2018, not June

22, 2018.  (Pls.' Stmt. 56.1 ¶ 13.) Plaintiff's amended complaint dated November 13, 2018

alleges "On or about May 22, 2018, Perkins performed buttox" surgery. (Amended Complaint p.

21.)  Accordingly, the parties made no mistake about the nature of their agreement; "the only

mistake [was] in the reduction of that agreement to writing," *Born*, 17 N.E. at 341, which is the

common law definition of a scrivener's error.  *See id.*; *see also 82-90 Broadway*, 62 N.Y.S.3d at

188.  Hence, because New York law permits scrivener's errors to be equitably reformed to honor

the original intentions of the contracting parties, the Court concludes that reformation is

appropriate.  *Born*, 17 N.E. at 341.  The General Release's date term shall be reformed to read:

May 22, 2018.[9]

### B.     *Mental Incapacitation*

Washington raises one other argument against the General Release's validity:  that she

was mentally incapacitated when she signed the General Release.  Recall that Washington

underwent remedial surgery at Miami Valley Hospital in Ohio on June 20, 2018—around the

same time she contacted Goals about a refund and shortly before the General Release was

executed on June 29.  *See supra* 3-4.  Following her remedial surgery, Washington alleges that

she was under the heavy influence of prescription drugs and therefore mentally incompetent to

---

[9] As a fallback position, Washington argues that the General Release is unambiguous and so, extrinsic evidence demonstrating the existence of a scrivener's error cannot be considered.  (Pls.' Opp. Br. at 14–15.)  The Court is unpersuaded.  *First*, this argument entirely contradicts Washington's main position that the General Release is *ambiguous* and therefore that the enforceability of the General Release should not be resolved on summary judgment. (Pls.' Opp. Br. at 13.)  *Second*, New York law erects no barrier to the consideration of extrinsic evidence in identifying a scrivener's error.  *See 82-90 Broadway Realty Corp. v. New York Supermarket, Inc.*, 62 N.Y.S.3d 186, 188 (2017) (N.Y. App. Div. 2d Dep't 2017) ("Where there is no mistake about the agreement and the only mistake alleged is in the reduction of that agreement to writing, such mistake of the scrivener, or of either party, no matter how it occurred, may be corrected.").  Accordingly, this alternative position must be rejected.

sign the General Release.

In New York, "[C]ontracts of a mentally incompetent person who has not been adjudicated insane are voidable." *Ortelere v. Teachers' Ret. Bd. of City of New York*, 25 N.Y.2d 196, 202 (1969). But, *prima facie*, the "capacity to contract is presumed." *DuFort*, 818 F. Supp. at 583 (discussing New York law). Accordingly, the burden is on the "party asserting incompetence [to] prove that status at the time of the disputed transaction," which is an "extremely heavy burden." *Id.* (cleaned up). To meet that burden, a party must prove (1) that "the mind was so affected as to render him wholly and absolutely incompetent to comprehend and understand the nature of the transaction," *Ortelere*, 25 N.Y.2d at 202–03, and (2) that the other contracting party "knew or should have known of his condition." *Id.* at 205; *see DuFort*, 818 F. Supp. at 582.

Applying the summary judgment standard, the Court concludes that no reasonable jury "could return a verdict" for Washington on either of these elements. *Anderson*, 477 U.S. at 247–48. *First*, Plaintiff comes forward with scant proof that her "mind was so affected" as to render her "wholly and absolutely incompetent to comprehend and understand the nature of the" General Release. *Ortelere*, 25 N.Y.2d at 202–03. The following captures the *entirety* of Washington's factual allegations on this element:

> Plaintiff testified that on June 29th that she was heavily medicated with narcotics and could not drive. She does not remember signing the release or being in the presence of a notary while signing the instrument. Plaintiff's understanding of the document is that she was "getting my money refunded." She did not have an understanding that by signing the document, she was giving up her right to file any lawsuit against GOALS. Plaintiff did not read the release until she consulted an attorney six [6] months later. Simply, plaintiff's injuries were grewsome and extremely painful requiring mind-altering narcotics.

(Pls.' Opp. Br. at 11.)

The Court finds these allegations fail to raise a genuine issue of material fact appropriate for

11

trial.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 322.  Put simply, these allegations are

bereft of factual support and amount to nothing more than Plaintiff's bare claim that she does not

recall reading or signing the General Release.  (Pls.' Opp. Br. at 11.)  That kind of proof cannot

overcome the evidentiary hurdle called for by summary judgment.  *Celotex Corp.*, 477 U.S. at

322.  The keys to a trial in federal court may be liberally given, but they are not free.  *Anderson*,

477 U.S. at 252 (recognizing that "a scintilla of evidence" is insufficient to defeat summary

judgment).

Moreover, the Court finds at least three undisputed facts on the record that support the

contrary proposition that Washington was mentally competent when she signed the General

Release:  (1) It was Washington who initiated contact with Goals about receiving a refund and

she who meticulously scanned photographs of her injuries and sent them to Goals in support of

her claim for a refund (*see, e.g.*, Washington Dep. 19:3; Call Logs); (2) Before signing the

General Release, Washington was aided by a close friend who helped her "understand what she

was signing and ensure that all documents were executed to obtain a refund" (Pls.' Stmt. 56.1 ¶

9); and (3) Washington executed the General Release before a notary public who certified that

her signature was "her voluntary act and deed."  (*See id.* ¶ 12; General Release at 2.)  Thus, in

considering these facts in tandem, the Court is further persuaded that "no reasonable jury could

return a verdict" for Washington.  *Anderson*, 477 U.S. at 248; *see Zenith Radio Corp.*, 475 U.S.

at 587.

*Second*, even if a reasonable jury could find mental incapacitation, summary judgment

must still be granted because Washington is unable to meet the second element of her mental

incompetency defense:  that the Defendants knew or should have known about her condition

when she signed the General Release.  *DuFort*, 818 F. Supp. at 582.  At her deposition, Plaintiff

conceded that she did not tell the Defendants that she was under the influence of prescription drugs at any point.  (Washington Dep. 23:3–6.)  The Defendants were therefore not on actual notice of her mental incapacity.  *DuFort*, 818 F. Supp. at 582.  Nor *should* they have known about her condition, given the fact that it was Washington who initially reached out to them about a refund and she who voluntarily agreed to sign the General Release.  *Id.*  All in all, the Court concludes that Plaintiff's mental incapacity defense must be rejected.[10]

### C.    *The General Release Is Enforceable*

Because Plaintiff's objections to the General Release are unavailing, the Court must enforce the General Release as written.  *Centro Empresarial*, 17 N.Y.3d at 276.  The terms of the General Release are pellucid:  they release the Defendants from any potential liability arising from the Lift Procedure.  (*See* General Release at 1.)  Accordingly, summary judgment must be granted with respect to the Plaintiff's lawsuit.

### CONCLUSION

The motion for summary judgment is **GRANTED**.  The remaining discovery motions in this case are **DISMISSED** as moot.[11]

The Clerk of the Court is directed to terminate this case.

---

[10] In *Ortelere v. Teachers' Retirement Board of City of New York*, 25 N.Y.2d at 196, the New York Court of Appeals did opine in dicta that the knowledge requirement of a mental incapacitation defense could be modified or done away with on equitable grounds.  *Id.* at 370 (explaining that "a court may grant relief on such equitable terms as the situation requires").  The Court, however, does not find it appropriate to exercise this equitable authority in the present case.  Nor does it find doing so would make any difference in view of the fact that Washington cannot meet the first requirement of her mental incompetency defense.

[11] As recounted above, Washington has received only $5,750 of the $6,095 that was promised by Goals under the terms of the General Release.  *See supra* 5 n. 6.  Because Washington has not pled a breach of contract claim for the outstanding balance, the Court cannot *sua sponte* order the remaining amount to be paid.  Nevertheless, the Court urges the Defendants to make good on their promise to remit the remaining amount to Washington.

Dated: New York, New York
     March 10, 2021

SO ORDERED

PAUL A. CROTTY
United States District Judge